## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ADAM KISSEL,
    *Plaintiff,*

    v.

MICHELLE H. SEAGULL, in her official
capacity as Commissioner of the Connecticut
Department of Consumer Protection,
    *Defendant.*

No. 3:21-cv-00120 (JAM)

## ORDER GRANTING IN PART AND DENYING IN PART
## MOTION FOR PRELIMINARY INJUNCTION

This case is about the First Amendment and a Connecticut law that regulates the activities

of paid solicitors for charitable organizations. Plaintiff Adam Kissel wishes to engage in paid

fundraising work for a non-profit civics education organization. But he claims that a Connecticut

law known as the Solicitation of Charitable Funds Act (the "SCFA") violates his First

Amendment right to engage in speech involving charitable fundraising. Kissel now seeks a

preliminary injunction.

Kissel first claims that the SCFA is based on a definition of "solicitation" that is

unconstitutionally vague and overbroad. I do not agree that the law is vague or overbroad simply

because it regulates not only "direct" solicitation activity but also "indirect" solicitation activity.

Accordingly, I will deny Kissel's motion for a preliminary injunction as to his challenge to the

statutory definition of what activity qualifies as a solicitation.

Kissel next claims that various provisions of the SCFA that apply to paid solicitors

violate his First Amendment right to free speech. He challenges four requirements: (1) that he

submit to the Connecticut Department of Consumer Protection ("DCP") a notice 20 days in

advance of his intent to engage in solicitation activity; (2) that he submit the text of his intended

1

solicitations to the DCP; (3) that he tell prospective donors what percentage of their donation will be given to the charitable organization; and (4) that he keep records of donors and donations for the DCP to inspect.

Because every one of these requirements is predicated on a content-based evaluation of the subject matter of Kissel's speech, I conclude that they are subject to strict scrutiny and that Kissel has established a strong likelihood of success under the demanding strict scrutiny standard. Except as to one of the four requirements (that he tell prospective donors what percentage of their donations will be given to the charitable organization), I conclude that Kissel has shown irreparable harm and that the balance of equities and the public interest weigh in his favor. Accordingly, I will grant the motion for a preliminary injunction to enjoin the Commissioner's enforcement of the requirement that he submit a notice 20 days before engaging in solicitation, to enjoin the requirement that he submit the text of his intended solicitations, and to enjoin the requirement that he keep records of his donors and donations so that they may be subject to inspection by the DCP.

## BACKGROUND

Kissel has substantial experience in higher education policy and philanthropy.[1] He has a contract for payment of an hourly fee to engage in charitable fundraising on behalf of the Jack Miller Center (the "JMC"), a non-profit 501(c)(3) organization that seeks to promote "education about America's founding principles and history."[2] Under the terms of his contract with the JMC, Kissel will seek to identify prospective donors for the JMC, some of whom are located in Connecticut.[3] According to Kissel, "Connecticut is a high priority state for me to be able to

---

[1] Doc. #1 at 3 (¶ 14); Doc. #13-2 at 2 (¶ 6).
[2] Doc. #1 at 4 (¶¶ 17, 19-20); Doc. #13-2 at 2 (¶¶ 6, 8).
[3] Doc. #1 at 4 (¶ 21); Doc. #13-2 at 2 (¶ 9).

engage in direct outreach to prospective donors. I have identified several large donors who live in Connecticut and have an interest in civic education."[4]

The SCFA imposes certain regulations on charitable solicitation activity in Connecticut. *See* Conn. Gen. Stat. § 21a-175 *et seq*. The Act is enforced by the Connecticut DCP, and Kissel has filed this action against the defendant Michelle H. Seagull in her official capacity as Commissioner of the DCP.[5]

Kissel's anticipated fundraising activity on behalf of the JMC would subject him to regulation as a "paid solicitor" under the SCFA. The SCFA defines a paid solicitor as:

> [A] person who for any consideration, other than any nonmonetary gift of nominal value awarded to a volunteer solicitor as an incentive or token of appreciation, performs for a charitable organization any service in connection with which contributions are solicited by such person or by any person he directly or indirectly employs, procures or engages to solicit for such compensation.

Conn. Gen. Stat. § 21a-190a(7).

The SCFA imposes numerous requirements on paid solicitors that are relevant to this lawsuit. First, a paid solicitor must register with the DCP on an annual basis and pay a fee. *See* Conn. Gen. Stat. § 21a-190f(a).[6]

Second, a paid solicitor must file a solicitation notice with the DCP at least 20 days before beginning a solicitation campaign. This 20-day advance notice must include a description of the solicitation event or campaign as well as a copy of the solicitor's contract with the

---

[4] Doc. #13-2 at 3 (¶ 13); *id.* at 4 (¶¶ 16-17) (noting other non-profit organizations beyond the JMC that Kissel would like to fundraise for in Connecticut).

[5] *Id.* at 3 (¶ 13).

[6] This provision of the SCFA states as follows: "(a) No person shall act as a paid solicitor unless such person has first registered with the department. Registration shall be in a form prescribed by the commissioner, shall be certified by the paid solicitor as true and correct to the best of the solicitor's knowledge and shall be accompanied by a fee in the amount of five hundred dollars. The application shall contain such information as the department shall require. Each registration shall be valid for one year and may be renewed for additional one-year periods." Conn. Gen. Stat. § 21a-190f(a). Although the registration requirement is discussed in the parties' papers, Kissel does not challenge the requirement for purposes of his motion for preliminary injunction.

organization. *See* Conn. Gen. Stat. § 21a-190f(c).[7] I will call this requirement the "20-day notice requirement."

Third, as part of the 20-day notice requirement, a paid solicitor must submit to the DCP a copy of any "campaign solicitation literature, including the text of any solicitation to be made orally." *Ibid.* I will call this requirement the "literature requirement."

Fourth, a paid solicitor must disclose to a prospective donor the fact that he or she is a paid solicitor and the percentage of the gross revenue that the charitable organization shall receive from the solicitor's campaign. *See* Conn. Gen. Stat. § 21a-190f(e).[8] I will call this requirement the "financial disclosure requirement."

Fifth and finally, a paid solicitor must keep records containing the identities of donors and their contribution amounts for at least three years and make these records available to the DCP for inspection upon request. Conn. Gen. Stat. § 21a-190f(k).[9] I will call this requirement the

---

[7] This provision of the SCFA states as follows: "(c) No less than twenty days prior to the commencement of each solicitation campaign, a paid solicitor shall file with the department a copy of the contract described in subsection (d) of this section and shall complete a solicitation notice in a form prescribed by the commissioner. A solicitation notice shall be certified by the paid solicitor as true and correct to the best of the solicitor's knowledge and shall include a description of the solicitation event or campaign, the location and telephone number from which the solicitation is to be conducted, the names and residence addresses of all employees, agents or other persons however styled who are to solicit during such campaign and the account number and location of all bank accounts where receipts from such campaign are to be deposited. Copies of campaign solicitation literature, including the text of any solicitation to be made orally, shall be submitted to the department. The charitable organization on whose behalf the paid solicitor is acting shall certify that the solicitation notice and accompanying material are true and complete. Prior to the commencement of such solicitation campaign, the commissioner shall publicize such solicitation by posting on the department's web site information describing the terms of the contract between the paid solicitor and the charitable organization, the dates of such solicitation campaign and the percentage of the raised funds to be retained by the paid solicitor. The commissioner may publicize such solicitation through any additional means the commissioner deems appropriate." Conn. Gen. Stat. § 21a-190f(c).

[8] This provision of the SCFA states as follows: "(e) A paid solicitor shall, prior to orally requesting a contribution, and at the same time at which a written request for a contribution is made, clearly and conspicuously disclose at the point of solicitation such solicitor's name as on file with the department, the fact that such solicitor is a paid solicitor and the percentage of the gross revenue which the charitable organization shall receive as identified in subsection (d) of this section." Conn. Gen. Stat. § 21a-190f(e).

[9] This provision of the SCFA states as follows: "(k) A paid solicitor shall maintain during each solicitation campaign and for not less than three years after the completion of each such campaign the following records, which shall be available to the department for inspection upon request: (1) The name and address of each contributor and the date and amount of the contribution, provided the department shall not disclose this information except to the extent necessary for investigative or law enforcement purposes; (2) the name and residence of each employee, agent or other person involved in the solicitation; and (3) records of all income received and expenses incurred in the course

4

"donor record-keeping and inspection requirement."

Connecticut law includes enforcement provisions for violations of the SCFA. The Commissioner may deny, suspend, or revoke the registration of any paid solicitor who violates the SCFA.[10] Moreover, any person who knowingly violates the requirements of the SCFA may be fined up to $5,000 and/or imprisoned for up to one year.[11]

According to Kissel, he is not currently engaging in paid fundraising for the JMC or other charitable organizations because this "would subject me to a host of requirements that burden my right to speak freely."[12] Kissel has instead filed this lawsuit and now moves for a preliminary injunction. He argues that the SCFA's definition of solicitation activity is unconstitutionally vague and overbroad. He further argues that four of the SCFA's requirements—including the 20-day notice requirement, the literature requirement, the financial disclosure requirement, and the donor record-keeping and inspection requirement—violate his First Amendment rights. As Kissel made clear at oral argument, he seeks a preliminary injunction only to enjoin the DCP from enforcing the SCFA and these requirements against him, not against other persons who may qualify as paid solicitors.

## DISCUSSION

A preliminary injunction is an extraordinary form of relief that a court may enter only if it makes certain findings in a plaintiff's favor. When a plaintiff seeks to enjoin the government's enforcement of a statutory or regulatory scheme, a federal court may not enter an injunction unless the plaintiff shows (1) that the plaintiff is suffering irreparable harm, (2) that the plaintiff has a clear and substantial likelihood of success on the merits, (3) that the balance of equities tips

---

of the solicitation campaign." Conn. Gen. Stat. § 21a-190f(k).
[10] *See* Conn. Gen. State. § 21a-190l(a).
[11] *See* Conn. Gen. State. § 21a-190l(c).
[12] Doc. #13-2 at 3-4 (¶ 15); *see also id.* (¶¶ 16-17).

in the plaintiff's favor rather than the defendant's favor, and (4) that an injunction is in the public

interest. *See Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 225 (2d Cir. 2021);

*Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir.

2014). This standard reflects an understanding that governmental policies enacted consistent with

democratic principles are entitled to a high degree of deference and should not be enjoined

lightly. *Id.* at 110. I will first address the requirement of a likelihood of Kissel's success on the

merits before turning to whether he has shown irreparable harm and whether the balance of the

equities and public interest weigh in his favor.[13]

### A. *Likelihood of success on the merits*

Kissel challenges several provisions of the SCFA. First, he raises a vagueness and

overbreadth challenge to the definition of solicitation that serves as the basis for qualifying him

as a paid solicitor and therefore subject to regulation. Second, he raises a First Amendment free-

speech challenge to several of the restrictions that would apply to him as a paid solicitor.

### 1. *Vagueness and overbreadth challenge to definition of solicitation*

Kissel challenges the statutory definition of a "paid solicitor," arguing that this term is

defined by reference to a definition of the terms "solicit" and "solicitation" that is

unconstitutionally vague and overbroad. The SCFA defines "solicit" and "solicitation" in

principal part to mean "any request *directly or indirectly* for money, credit, property, financial

assistance or other thing of any kind or value on the plea or representation that such money,

credit, property, financial assistance or other thing of any kind or value is to be used for a

---

[13] I conducted a video hearing with counsel on the motion for preliminary injunction. There was no request for an evidentiary hearing or consideration of additional evidentiary materials beyond the affidavits and documents of record. Although the parties differ concerning what inferences should be drawn from the evidentiary record and how the SCFA should be properly construed, they do not meaningfully dispute each other's recitation of the facts in terms of what Kissel wishes to do and the Commissioner's enforcement actions with respect to the statute.

charitable purpose or benefit a charitable organization."[14] According to Kissel, this definition is vague and overbroad because it extends not only to "directly" requesting money but also to "indirectly" requesting money.

" "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).[15] "When a statute is capable of reaching expression sheltered by the First Amendment, the vagueness doctrine demands a greater degree of specificity than in other contexts." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010).

Still, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). As the Supreme Court has noted, "while there is little doubt that imagination can conjure up hypothetical cases in which the meaning of [particular] terms will be in nice question, because we are condemned to the use of words, we can never expect mathematical certainty from our language." *Hill*, 530 U.S. at 733.

I am not convinced by Kissel's argument that a statute that regulates an act of "directly" or "indirectly" engaging in certain activity is too vague for an ordinary person to understand. The Merriam-Webster Dictionary defines "direct" as "natural, straightforward," while defining

---

[14] Conn. Gen. Stat. § 21a-190a(3) (emphasis added). The statutory definition goes on to include a non-exhaustive list of examples of the types of conduct that constitute solicitation, including but not limited to (A) "[a]ny oral or written request," (B) any mass media public "announcement … concerning an appeal or campaign by or for any charitable organization or purpose"; (C) the distribution or circulation of "any handbill, written advertisement or other publication," and (D) the sale or attempted sale of items in connection with any statement that the proceeds will benefit a charitable purpose or organization. Conn. Gen. Stat. § 21a-190a(3).

[15] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

"indirect" as "deviating from a direct line or course" and "not going straight to the point."[16]
From the ordinary meaning of these words, it is clear that the SCFA's use of the phrase "directly
or indirectly" is meant to sweep within its ambit both straightforward requests for money—*e.g.*,
"Would you like to donate?"—and less straightforward requests—*e.g.*, "The organization is
happy to accept donations"—that unmistakably constitute requests for money. Moreover,
consistent with the examples described in the statutory definition of "solicit" and "solicitation,"
an indirect request for money would likewise include a request for money that is made through
an advertisement or intermediary.[17]

While one might conjure vexing hypotheticals to test the outer bounds of what is "direct"
and "indirect," the definition and distinction between a "direct" request for money and an
"indirect" request for money clearly "delineates its reach in words of common understanding,"
*Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972). Not surprisingly, many laws impose
limits by reference to "direct" or "indirect" activities, and the Supreme Court, the Second
Circuit, and other courts alike routinely reject vagueness challenges to such measures. *See, e.g.*,
*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 576-77, 581
(1973) (rejecting vagueness challenge to federal Hatch Act barring political activity by federal
employees whether the employee does so "directly or personally" or "indirectly or through an
agent"); *United States v. Johnson*, 446 F.3d 272, 280-81 (2d Cir. 2006) (rejecting vagueness
challenge to supervised release condition barring defendant from having any "direct" or
"indirect" contact with minors); *United States v. Irwin*, 354 F.2d 192, 195 (2d Cir. 1965)
(rejecting vagueness challenge to bribery statute barring "directly or indirectly giv[ing],

---

[16] *See Direct*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/direct
[https://perma.cc/EXY3-Y96X] (last accessed July 21, 2021); *Indirect*, Merriam-Webster Dictionary,
https://www.merriam-webster.com/dictionary/indirect [https://perma.cc/EWG2-B46Y] (last accessed July 21, 2021).
[17] *See* Conn. Gen. Stat. § 21a-190a(3).

offer[ing], or promis[ing] anything of value to any public official"); *see also Alaska Right to Life Comm. v. Miles*, 441 F.3d 773 (9th Cir. 2006) (rejecting vagueness challenge to Alaska statute defining an "electioneering communication" to mean a communication that "directly or indirectly identifies a candidate"); *State by Spannaus v. Century Camera, Inc.*, 309 N.W.2d 735, 745 (Minn. 1981) (rejecting vagueness challenge to Minnesota statute barring employers from "directly or indirectly solicit[ing] or requir[ing]" employees or potential employees to take polygraph-style tests).

Kissel's vagueness challenge focuses on four hypotheticals he posed to the DCP prior to the filing of this lawsuit:

1) I plan to host a presentation for a small group of 5-10 prospective donors in which I discuss several charitable organizations in the education sphere that are worthy of their donations, including at least one of the organizations that is providing me compensation. I will not expressly direct the donors to make a donation, but I intend to mention the fact that these are 501(c)(3) organizations that are happy to accept contributions.

2) I plan to participate in conversations between a prospective donor and a representative of the organization that is paying me for my time, whether or not I directly ask for a contribution.

3) I plan to reach out to prospective donor contacts via email to discuss the charity that I am working for and to offer to make an introduction to an officer of the organization that I am working for in order for them to discuss a donation.

4) I plan to call a prospective donor and tell him why he should make a donation to the organization that is compensating me, and then direct him to the organization's website to make a donation.[18]

A staff attorney at the DCP responded that for hypothetical scenarios (1) and (4), "it would seem that you would be considered a paid solicitor … because you would be indirectly requesting contributions in scenario (1), and directly requesting donations in scenario (4)."[19] "As

---

[18] Doc. #13-4 at 2.
[19] Doc. #13-5 at 1.

to scenarios (2) and (3), we would need additional facts to make a definite determination, but as a general matter, 'solicitation' occurs only when you directly or indirectly make a request for contribution."[20]

Although Kissel faults the DCP for failing to answer two of his scenarios, it is Kissel himself who did not provide critical information. Scenario (2) posits "participat[ing] in conversations between a prospective donor and a representative of the [JMC], *whether or not I directly ask for a contribution*."[21] That information—whether or not Kissel actually asked for or discussed a contribution—is the very information that the DCP (or this Court, for that matter) would need to know in order to decide if Kissel's conversation qualifies as a "request" and hence a solicitation under the statute.

Similarly, for scenario (3) when Kissel states that he wishes to "reach out" to one of his contacts whom he considers to be a prospective donor to make an "introduction" to a JMC officer "in order for them to discuss a donation," is he referring to his own unstated purpose for making the introduction? Or is he referring to what he would actually tell the prospective donor is the reason why he is making the introduction? It is little wonder that the DCP responded that it would need to know additional facts in order to advise Kissel whether his proposed course of action would constitute a solicitation.

Kissel's vagueness challenge does not turn on uncertainty about the scope of what is an "indirect" solicitation. It turns instead on his insistence that he receive guidance from the DCP about how the statute applies to scenarios for which he has not furnished critical and clarifying information.

Kissel's overbreadth challenge fares no better at this stage of the litigation. Challenges to

---

[20] *Ibid.*
[21] Doc. #13-4 at 2 (emphasis added).

statutes as overbroad are claims that a statute "would violate the First Amendment rights of hypothetical third parties if applied to them." *United States v. Smith*, 945 F.3d 729, 736 (2d Cir. 2019). A statute is facially overbroad if it "prohibits a substantial amount of protected speech." *Golb v. Attorney Gen. of the State of N.Y.*, 870 F.3d 89, 101 (2d Cir. 2017) (quoting *United States v. Williams*, 553 U.S. 285, 292-93 (2008)). A statute's overbreadth must be "*substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep," and "[i]nvalidation for overbreadth is strong medicine that is not to be casually employed." *Ibid.* (emphasis in original).

To analyze whether a statute is overbroad, a court must first "construe the challenged statute" as it is "impossible to determine whether a statute reaches too far without knowing what the statute covers." *Adams v. Zenas Zelotes, Esq.*, 606 F.3d 34, 38 (2d Cir. 2010) (*per curiam*). Further, the party challenging the statute as overbroad "must demonstrate from the text of the law and from actual fact that a substantial number of instances exist in which the law cannot be applied constitutionally." *United States v. Thompson*, 896 F.3d 155, 163 (2d Cir. 2018).

I have already determined that the statute's use of the phrase "directly or indirectly" has a clear enough meaning to withstand a constitutional vagueness challenge. Kissel has not pointed to a substantial number of instances in which the statute could not be applied constitutionally. In light of the DCP's inconclusive response to scenario (2), he claims that he "cannot talk to any of his friends or acquaintances in Connecticut about JMC, *even if that conversation does not involve a request for a donation*, because his role as a JMC fundraiser necessarily entails 'indirect' requests for funding."[22] This concern makes no sense in the absence of a direct or

---

[22] Doc. #13-1 at 44 (emphasis added); *see also* Doc. #13-2 at 5-6 (¶ 21) (Kissel's affidavit claiming that "it isn't clear to me whether I would be making an indirect request or solicitation if I speak about JMC to someone who knows I am working for JMC (without making an ask for money), participate in a phone call between a representative of JMC and a prospective donor (without making an ask for money), or merely facilitate an

indirect request for money. Kissel has not shown any likelihood that the statute would be or could be reasonably read to apply to any conversation that a fundraiser for a charitable organization has that merely mentions or discusses the organization without any corresponding request for money.

In short, Kissel has failed to show a likelihood of success as to his claim that the definition of solicitation is unconstitutionally vague or that it is overbroad. Accordingly, I will deny Kissel's motion for preliminary injunction as to these challenges to the SCFA.

### 2. *First Amendment free speech*

The Free Speech Clause of the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const., amend. I. The protections of the First Amendment of course have long been applicable by incorporation under the Fourteenth Amendment against the States and their localities. *See* U.S. Const. amend. XIV; *Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940).

Free speech protections extend to charitable solicitations as well: "[C]haritable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980).

The Supreme Court has long made clear that when the government regulates expressive activity on the basis of its content, the law is subject to the most demanding "strict" form of scrutiny. *See, e.g.*, *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). By contrast, when a law affects speech but is unrelated to the content of the speech, it is subject instead to

---

introduction between JMC and a prospective donor (once again without making an ask for money))."

some form of less demanding, "intermediate" scrutiny. *Ibid.*; *see generally* Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. REV. 1267 (2007).

Under the First Amendment, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). As the Supreme Court made clear in *Reed*, a speech regulation is content-based if it applies to particular speech "because of the topic discussed or the idea or message expressed." *Ibid.* To decide if a particular speech regulation is content-based, a court must consider whether the regulation "'on its face' draws distinctions based on the message a speaker conveys." *Ibid.* "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose," but "[b]oth are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* at 163-64.

More recently, the Supreme Court has explained that even if a regulation does not distinguish among certain viewpoints about a particular topic or subject matter, that regulation is content-based if it "singles out specific subject matter for differential treatment." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020). "For example, a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Ibid.*

To the same effect, the Second Circuit has ruled that an ordinance that bars "soliciting" for a specific purpose is an ordinance that is content-based. *See Centro de la Comunidad Hispana v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017). The ordinance at issue barred

anyone on a public right of way from stopping or attempting to stop a vehicle "for the purpose of soliciting employment." *Id.* at 107. The Second Circuit observed that "[a]lthough the Ordinance has a conduct component—the attempted stopping of a vehicle—the Ordinance only punishes such conduct if done 'for the purpose of soliciting employment.'" *Id.* at 112. This meant that the ordinance was content-based, because "[t]own officials must monitor and evaluate the speech of those stopping or attempting to stop vehicles and they may sanction the speaker only if a suspect says the wrong thing, for example, 'hire me' as opposed to 'tell me the time.'" *Ibid.*

The same holds true here. In order to determine whether the paid solicitor restrictions apply to Kissel, one must consider on its face the subject matter of what Kissel decides to say— that is, whether he has made a request for money to help a charity. If Kissel instead chooses merely to provide informational literature about the JMC to interested parties, to host presentations about the JMC's activities, or to publish articles about why he supports the JMC, the SCFA's paid solicitor requirements would not apply to him. But if Kissel turns the topic of conversation to requesting money for the JMC, the SCFA's paid solicitor requirements apply. The SCFA's regulation of paid solicitors is therefore content-based.

The content-based nature of the law at issue here is no different than other restrictions that the Supreme Court has ruled in recent years to be content-based. In *Barr*, the Supreme Court ruled that a federal law that generally barred robocalls except for robocalls seeking to collect government debt was content-based. 140 S. Ct. at 2343-45. In *Reed*, the Supreme Court ruled that a town ordinance imposing different restrictions on signage based upon whether the signs were "temporary direction signs" or "political signs" or "ideological signs" was content-based. 576 U.S. at 159-60. And in *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563-64 (2011), the Supreme Court ruled that a law singling out pharmaceutical marketing communications for

unfavorable treatment was content-based.

Many other courts have ruled in light of the Supreme Court's decision in *Reed* that laws targeting speech involving requests for money are content-based. *See, e.g.*, *Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019) (ruling that an Arkansas statute that prohibited individuals from "[l]inger[ing] or remain[ing]" in certain areas "for the purpose of asking for anything as charity or a gift" in certain ways was a content-based restriction because it regulated speech based on the topic discussed); *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1226 (9th Cir. 2019) (ruling that a Montana robocall statute that prohibited individuals from using a robocall system for the purpose of, among other things, "conveying information on goods or services in soliciting sales or purchases" and "soliciting information" was content-based because it "explicitly target[ed] certain speech for regulation based on the topic of that speech"); *Dumiak v. Village of Downers Grove*, 475 F. Supp. 3d 851, 855-56 (N.D. Ill. 2020) (ruling that a village ordinance that required individuals soliciting money from drivers to have a certificate of registration and an Illinois statute that made it a misdemeanor to solicit money from cars on the highway were content-based because the regulations applied based on the topic discussed); *Blitch v. City of Slidell*, 260 F. Supp. 3d 656, 666 (E.D. La. 2017) (ruling that a city ordinance was content-based on its face because it only applied to speakers that wished to "beg or panhandle," and therefore regulated speech "both by its subject matter and by its purpose"); *Working Am., Inc. v. City of Bloomington*, 142 F. Supp. 3d 823, 831 (D. Minn. 2015) (ruling that a city ordinance was content-based because it required a permit for "speech that has the function or purpose of generating money" but did not require a permit for "speech that lack[ed] such purpose" and was instead intended, for example, "to raise awareness for an issue or collect

signatures for a proposed ballot initiative.").[23]

Indeed, the Supreme Court's decision in *Reed* is widely understood to have broken new ground by explaining how a law may be content-based and subject to strict scrutiny even if the law does not favor one viewpoint over another or reflect any invidious government purpose. As Judge Easterbrook has written, "*Reed* understands content discrimination differently," and "[t]he majority opinion in *Reed* effectively abolishes any distinction between content regulation and subject-matter regulation," such that "[a]ny law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification." *Norton v. City of Springfield, Ill.*, 806 F.3d 411, 412 (7th Cir. 2015).[24] It is telling that the Commissioner's briefing does not cite or discuss the *Reed* decision despite its fundamental significance to the methodology for determining whether a law is content-based.

The Commissioner argues that the SCFA is a speaker-based regulation rather than a content-based one: it restricts only the right of paid solicitors to seek charitable donations while allowing others, such as unpaid volunteers or even a charity's own employees, free to seek charitable donations without the restrictions placed on paid solicitors.[25] This argument misses the point. When the government decides to impose restrictions only on particular classes of speakers but not others, this may raise concerns that the government has imposed a restriction on speech

---

[23] The Commissioner does not argue that the paid solicitor restriction is a restriction on commercial speech. *See Vugo, Inc. v. City of New York*, 931 F.3d 42, 50 (2d Cir. 2019) (content-based restriction on commercial speech subject to intermediate scrutiny).

[24] *See also Reagan Nat'l Advert. of Austin, Inc. v. City of Austin*, 972 F.3d 696, 702-03 (5th Cir. 2020) (discussing various federal appeals court rulings recognizing *Reed* as a "drastic change" and a "sea change" in First Amendment doctrine), *cert. granted sub nom. Austin, TX v. Reagan Nat. Advertising*, No. 20-1029, 2021 WL 2637836 (U.S. 2021); *see also* Genevieve Lakier, Reed v. Town of Gilbert, Arizona*, and the Rise of the Anticlassificatory First Amendmen*t, 2016 SUP. CT. REV. 233, 235 (2016) (explaining how "*Reed* thus represents an important change in First Amendment doctrine, and one that will in all likelihood have a significant impact in many areas of law"); Urja Mittal, *The "Supreme Board of Sign Review": Reed and its Aftermath*, 125 YALE L.J. F. 359, 359 (noting that *Reed* is one of the "quieter, lesser known cases that revolutionize the [First Amendment] doctrine" of content-based restrictions).

[25] The statute provides that "[a] bona fide nontemporary salaried officer or employee of a charitable organization shall not be deemed to be a paid solicitor." Conn. Gen. Stat. § 21a-190a(7).

for an improper content censorship purpose, because "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Reed*, 576 U.S. at 170. But where, as here, the government adds a speaker-based distinction on top of what is already a facially content-based distinction, this does not cure or cancel out the initial content-based distinction, much less does it relieve the government from satisfying the strict scrutiny standard.

Accordingly, I must evaluate the paid solicitor requirements under strict scrutiny and determine whether the DCP has shown that the specific challenged provisions are narrowly tailored to serve compelling state interests. This will not take long because even the Commissioner's counsel conceded at oral argument that he would probably agree that at this initial stage of the proceedings there is nothing in the record that would suffice to show that any of the challenged provisions survive strict scrutiny.

### *The 20-day notice requirement*

As to the 20-day notice requirement, the DCP allows paid solicitors to submit the solicitation notice via either an online portal or by completing and emailing to the DCP a two-page form that can be downloaded from the DCP's public website.[26] That form requires information such as:

- the paid solicitor and the charitable organization's names, addresses, and Connecticut registration numbers;

- the dates the solicitation campaign will begin and end;

- the minimum gross receipts guaranteed to the charitable organization by the contract between the solicitor and the organization;

- the methods by which the soliciting will be conducted, *e.g.*, by telephone, mail, electronic

---

[26] *See* Connecticut State Department of Consumer Protection, Paid Solicitor Filings, https://portal.ct.gov/DCP/License-Services-Division/All-License-Applications/Paid-Solicitor-Filings [https://perma.cc/6WZE-D4FG] (last accessed July 21, 2021).

media, print media, door-to-door, or other;

- for oral solicitations, a copy of the text or script of the solicitation;

- a complete copy of written solicitation material;

- a copy of the contract between the solicitor and the charitable organization;

- bank account information for where receipts from the solicitation campaign will be deposited; and

- whether any of the individuals who will solicit as part of the campaign have been convicted of a felony or any misdemeanor involving dishonesty or arising from the conduct of a solicitation for a charitable organization or charitable purpose.[27]

When the DCP receives a solicitation notice, a DCP employee checks if the paid solicitor has an active registration with the department and "reviews the notice to ensure that all of the information required by the statute is included," but does not "substantively review the content of any of the information submitted with the notice, and does not undertake any kind of 'approval' process of it."[28]

The statute itself also requires the Commissioner to "publicize such solicitation [campaigns] by posting on the [DCP]'s web site information describing the terms of the contract between the paid solicitor and the charitable organization, the dates of such solicitation campaign and the percentage of the raised funds to be retained by the paid solicitor," and allows the Commissioner to further "publicize such solicitation [campaigns] through any additional means the commissioner deems appropriate."[29]

The State of Connecticut's public website provides a "license lookup" feature, which

---

[27] *See* State of Connecticut Department of Consumer Protection, Solicitation Notice, https://portal.ct.gov/-/media/DCP/pdf/Applications_Added_2017/cpc58solicitationnoticeApplicationMay17pdf.pdf [https://perma.cc/JK2Z-UC85] (last accessed July 21, 2021).
[28] Doc. #24-1 at 9 (¶ 30).
[29] Conn. Gen. Stat. § 21a-190f(c).

allows the public to search for paid solicitor registrations by license number, name, and address, among other search options.[30] Entries on the public website provide the name, address, registration number, registration type, effective and expiration dates, and status (*e.g.*, active or inactive) of paid solicitors. For those paid solicitors engaged in active campaign solicitations, the public website further provides the charity name, credential number, status, effective and expiration dates of the campaign, and the minimum percentage of gross revenue guaranteed to go to the charitable organization.

The Commissioner asserts that the 20-day notice requirement serves two purposes: to prevent fraud and to promote public information about charitable solicitation campaigns in general.[31] Even if I assume that either or both of these interests are compelling, the record does not establish that a full 20-day notice requirement is narrowly tailored to prevent fraud or promote public information. The Commissioner does not show why she needs 20 days in order to review the notice or to post it to the DCP's website for public informational and reference purposes.

As the First Circuit has observed in the context of invalidating an ordinance that required a permit application 30 days before a parade or march, notice or waiting periods "restrict spontaneous free expression and assembly rights safeguarded in the First Amendment," and such notice or waiting periods "can be no longer than necessary to meet" the government's particular interests. *Sullivan v. City of Augusta*, 511 F.3d 16, 38-39 (1st Cir. 2007) (collecting cases permitting two- or three-day waiting periods for parades or public gatherings). In a similar context, the Ninth Circuit has stated that "[a]ll available precedent suggests that a 20-day

---

[30] *See* State of Connecticut, License Lookup, https://www.elicense.ct.gov/Lookup/LicenseLookup.aspx [https://perma.cc/V7Y8-ER22] (last accessed July 21, 2021).
[31] Doc. #24-1 at 5 (¶¶ 13-14).

advance notice requirement is overbroad." *NAACP, W. Region v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir. 1984).

The statute's 20-day notice requirement has not been shown on the present record to be narrowly tailored to serve a compelling government interest. Accordingly, Kissel has established a clear and substantial likelihood of success with respect to his claim that the 20-day notice requirement violates his right to free speech under the First Amendment.[32]

### *The literature requirement*

As to the literature requirement, the SCFA explicitly requires a paid solicitor to submit "the text of any solicitation to be made orally" to a prospective donor. Conn. Gen. Stat. § 21a-190f(c). This imposes an extraordinary burden on a paid solicitor not only to prepare and stick to a script ("the text of any solicitation") for purposes of oral solicitation communications but also to submit the prepared script to the Commissioner for her advance review some 20 days in advance.

The Commissioner does not attempt to defend the statute's requirement that a paid solicitor submit "the text of any solicitation." Instead, the Commissioner tries to re-cast the provision to require that a paid solicitor merely submit an "outline of the general topics that the solicitor intends to discuss," and that "[t]his outline can be high-level and can be broad enough to permit the solicitor to adapt his or her solicitations to account for current events as they unfold."[33]

---

[32] Because the 20-day notice requirement is predicated on a content-based regulation of speech and does not survive strict scrutiny, there is no need for me to address whether it also operates as a prohibited prior restraint on speech. *See, e.g.*, *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1232-34 (4th Cir. 1989) (holding that requirement of Virginia's charitable solicitation laws that fundraisers submit script of oral solicitation to the Commissioner of the Office of Consumer Affairs at least ten days prior to commencement of solicitation was an unconstitutional prior restraint).

[33] Doc. #24-1 at 11 (¶ 39); *see also* Doc. #24 at 23-24, 27. Although the Commissioner's papers advance numerous narrowing constructions of the SCFA, the Commissioner has not issued regulations as is authorized under Conn. Gen. Stat. § 21a-190k to authoritatively adopt these interpretations of the statute.

But this reinterpretation cannot be squared with the words of the statute or even with the DCP's own official notice form which states: "For oral solicitations, attach a copy of the text or script."[34] Neither the statute nor the notice form say anything to suggest that a simple outline or talking points will do.

In any event, I asked the Commissioner's counsel at oral argument just how "high level" an "outline" may be to satisfy the statute. What if Kissel wanted to submit an outline that had the following two points: "Point A. Contact donor. Point B. Money for JMC"? The answer was that the DCP would probably accept such a bare bones outline. But if that is all the statute requires— no more than a vague and meaningless outline—then this requirement falls well short of serving any compelling purpose of preventing fraud and promoting public information about charitable solicitation activity.

The statute's literature requirement (whether as actually written or as reimagined by the Commissioner) is not narrowly tailored to serve a compelling purpose. Accordingly, Kissel has established a clear and substantial likelihood of success with respect to his claim that the literature requirement violates his right to free speech under the First Amendment.

### *The financial disclosure requirement*

As to the financial disclosure requirement, the Commissioner does not attempt to defend the constitutionality of the requirement that a paid solicitor tell each prospective donor what percentage of any donation a charity will receive. In *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988), the Supreme Court invalidated a very similar North Carolina law. The Court ruled at the outset that this requirement was content-based because

---

[34] *See* State of Connecticut Department of Consumer Protection, Solicitation Notice, https://portal.ct.gov/-/media/DCP/pdf/Applications_Added_2017/cpc58solicitationnoticeApplicationMay17pdf.pdf [https://perma.cc/JK2Z-UC85] (last accessed July 21, 2021).

"[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Id.* at 795. The Court then concluded that this categorical disclosure requirement was not narrowly tailored to preventing fraud in light of "more benign and narrowly tailored options [that] are available." *Id.* at 800. Rather than seek to distinguish *Riley*, the Commissioner states that she does not enforce this provision of the law.[35]

The statute's financial disclosure requirement is not narrowly tailored to serve a compelling purpose. Accordingly, Kissel has established a clear and substantial likelihood of success with respect to his claim that the financial disclosure requirement violates his right to free speech under the First Amendment.

### The donor record-keeping and inspection requirement

As to the donor record-keeping and inspection requirement, it is predicated as discussed above on a content-based law that subjects Kissel's right to free speech to a burden to retain the names of and information about his donors so that the information is available in the event that the DCP requests the information. As a record-keeping burden that is imposed only as a result of a content-based law governing who qualifies as a paid solicitor, the burden is subject to strict scrutiny. The nexus to protected speech is manifest from the fact that charities that do *not* use paid solicitors for their fundraising purposes are not required by Connecticut law to maintain and supply records of donations and the identities of those who donate to the charity.

The Commissioner does not show that the law's record-keeping and inspection burdens are narrowly tailored to serve a compelling purpose. As Kissel notes, there are ample alternatives to the compelled record-keeping and inspection requirement. For example, the law could require that a paid solicitor furnish a donor with a receipt to memorialize any donation and to facilitate

---

[35] Doc. #24-1 at 14 (¶ 49).

any investigation of fraud.

Moreover, the Commissioner's affiant—who has spent the last decade working for the DCP's Public Charities Examination Unit—states that "in my experience with DCP I am not aware of a single instance in which DCP ever asked to inspect the donor records collected by a paid solicitor under this provision."[36] The rarity of any such inspection requests undermines any claim by the Commissioner that there is a compelling reason to require Kissel to maintain donor records.

Apart from the burden imposed as a consequence of a content-based regulation of Kissel's free speech, the parties devote much of their briefing to the separate but related issue of whether the donor record-keeping and inspection requirement impinges on Kissel and his prospective donors' First Amendment right to association.[37] This issue is implicated by the Supreme Court's very recent decision in *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021), in which the Supreme Court facially invalidated a California regulation that required charitable organizations to disclose to the state attorney general the identities of their largest donors as stated in the organizations' federal tax returns.

The Supreme Court "conclude[d] that the Attorney General's disclosure requirement imposes a widespread burden on donors' associational rights," and that "this burden cannot be justified on the ground that the regime is narrowly tailored to investigating charitable wrongdoing, or that the State's interest in administrative convenience is sufficiently important." *Id.* at 2389. The reasoning of the Supreme Court in *Americans for Prosperity Foundation* additionally supports Kissel's challenge here.

The Commissioner strives to distinguish *Americans for Prosperity Foundation* on the

---

[36] Doc. #24-1 at 2-3, 15 (¶¶ 3, 53).
[37] Doc. #13-1 at 34-41; Doc. #24 at 28-31; Doc. #26 at 9-10.

ground that California's mandatory disclosure requirement is different from Connecticut's requirement that a paid solicitor merely maintain donor records in the event of a request by the Commissioner to inspect the records.[38] But California's mandatory disclosure requirement can also be framed as less burdensome than the Connecticut law because it required disclosure of only an organization's largest donors as already reported to the IRS, while the Connecticut law requires a paid solicitor to maintain records for and potentially disclose *all* donors and donations. Although the Commissioner states that the DCP would seek to inspect the records "only if there is a valid investigative or law enforcement purpose,"[39] the statute allows for the inspection of the records "on request" and imposes no such limitation on the Commissioner's purpose for making a request. The Commissioner's affiant elsewhere states that the DCP might seek access to the records merely for an "audit" of a solicitation campaign.[40] In addition, although the Commissioner insists that she has not "historically required disclosure of the names and addresses of donors who wish to remain anonymous,"[41] she does not point to any provision of the law that would ensure this anonymity for Kissel's donors.

The Commissioner cannot meaningfully distinguish *Americans for Prosperity Foundation*. To the contrary, as noted above, Kissel's First Amendment claim is stronger than the First Amendment claim in *Americans for Prosperity Foundation* because it rests not only on the First Amendment right to association but also on the First Amendment right to free speech that is burdened by a content-based law that applies to him as a paid solicitor and that independently triggers strict scrutiny apart from any associational rights.

The Commissioner similarly misplaces her reliance on *Citizens United v. Schneiderman*,

---

[38] Doc. #29.
[39] *Id.* at 2.
[40] Doc. #24 at 15 (¶ 52).
[41] Doc. #13-5 at 1.

882 F.3d 374 (2d Cir. 2018). That case—like *Americans for Prosperity Foundation*—involved no more than a disclosure requirement imposed on non-profit organizations to disclose their donors on a yearly basis. It did not involve as here a disclosure requirement that was imposed on a class of persons—paid solicitors—that has been defined by reference to the content of the persons' speech.

The statute's donor record-keeping and inspection requirement is not narrowly tailored to serve a compelling purpose. Accordingly, Kissel has established a clear and substantial likelihood of success with respect to his claim that the requirement violates his right to free speech under the First Amendment.

### B. *Irreparable harm*

As a general matter, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) (quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (*per curiam*)). As the Second Circuit has noted, "[b]ecause the deprivation of First Amendment rights is an irreparable harm, in First Amendment cases the likelihood of success on the merits is the dominant, if not the dispositive, factor." *Id.* at 637.

I am satisfied from Kissel's submissions that he will suffer irreparable harm with respect to three of the four provisions of the SCFA that he now challenges by way of his preliminary injunction motion if they are permitted to be enforced against him. First, he will be irreparably harmed if he must comply with the 20-day notice requirement and especially the requirement that he submit the text of any intended solicitation. As Kissel makes clear, the notice and script requirements preclude him from engaging in protected solicitation speech in immediate response to breaking news events that in today's 24/7 news cycle are often most critical to solicitation

campaigns.[42] Kissel similarly states that he wishes to speak out critically against existing government policies as part of his solicitation activities for JMC but that the notice and script requirements deter him from speaking as candidly as he otherwise would to prospective donors.[43] Although the Commissioner suggests that she would not enforce the solicitation requirement for each individual solicitation but only for each solicitation campaign or contract period, the result is still that Kissel must abstain from engaging in protected speech for a 20-day time period.

As for the financial disclosure requirement, the Commissioner represents that the DCP no longer enforces this requirement. Kissel has accepted this representation and states that "a preliminary injunction on this issue is likely unnecessary."[44] In light of this concession, I conclude that Kissel has not shown irreparable harm as to the financial disclosure requirement.

Lastly, as to the donor record-keeping and inspection requirement, I agree with Kissel that, in view of the controversial issues taken on by him and the JMC, there is a fair likelihood that some potential donors will refrain from donating through Kissel if he must keep detailed records of their identities and donations as required by the SCFA and subject to the possibility that the DCP will decide to exercise its right under the statute to inspect these records.[45] As the Supreme Court stated in *Americans for Prosperity Foundation*, "[w]hen it comes to a person's beliefs and associations, broad and sweeping state inquiries into these protected areas ... discourage citizens from exercising rights protected by the Constitution." 141 S. Ct. at 2384.

### C.  *Balance of the equities and the public interest*

Kissel seeks a preliminary injunction that is narrow and consistent with an as-applied

---

[42] Doc. #13-1 at 22-23; Doc. #13-2 at 10 (¶ 40).
[43] Doc. #13-2 at 11-12 (¶¶ 42-45).
[44] Doc. #26 at 11 n.8.
[45] Doc. #13-2 at 12-13 (¶¶ 48-49).

challenge only to himself and for no other paid solicitor. The Commissioner has not suggested any reason to suppose that Kissel is poised to perpetrate a fraud or misinform the public if he is relieved for the duration of this litigation from the burden of complying with the 20-day notice requirement, the literature requirement, and the record-keeping and inspection requirement. The Commissioner will remain free for the balance of the litigation to administer and enforce the paid solicitor requirements as to all persons other than Kissel. Accordingly, I conclude in light of Kissel's very strong showing of a likelihood of success on his challenges to the 20-day notice requirement, the literature requirement, and the record-keeping and inspection requirement that the balance of equities and the public interest favor the grant of a preliminary injunction.

I will therefore grant Kissel's motion for a preliminary injunction in part to enjoin the Commissioner from enforcing the 20-day notice requirement, the literature requirement, and the donor record-keeping and inspection requirements of the SCFA against Kissel as an individual. On the other hand, because Kissel has not shown a likelihood of success as to his vagueness and overbreadth challenges to the definition of solicitation and because Kissel has not shown irreparable harm as to the financial disclosure requirement, I will deny his motion for a preliminary injunction in these respects.

## CONCLUSION

For the reasons set forth above, plaintiff Adam Kissel's motion for a preliminary injunction (Doc. #13) is GRANTED in part and DENIED in part. The motion is DENIED as to Kissel's vagueness and overbreadth challenges to the definition of "solicitation" under Conn. Gen. Stat. § 21a-190a(3). The motion is DENIED as to Kissel's challenge to the financial disclosure requirement under Conn. Gen. Stat. § 21a-190f(e). The motion is GRANTED as to Kissel's challenge to the 20-day notice and literature requirements of Conn. Gen. Stat. § 21a-

190f(c), and the donor record-keeping and inspection requirement of Conn. Gen. Stat. § 21a-190f(k).

The defendant Michelle H. Seagull, in her official capacity as the Commissioner of the Connecticut Department of Consumer Protection, is enjoined for the pendency of this action from enforcing against plaintiff Adam Kissel the 20-day notice and literature requirements of Conn. Gen. Stat. § 21a-190f(c) and the donor record-keeping and inspection requirement of Conn. Gen. Stat. § 21a-190f(k).

It is so ordered.

Dated at New Haven this 21st day of July 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge